# In the United States Court of Federal Claims

No.15-962C
(Filed: December 14, 2017)
NOT FOR PUBLICATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

WOODIES HOLDING L.L.C.,

*Plaintiff*,

v.

THE UNITED STATES,

*Defendant.*

Breach of lease; Tax adjustment clause; Reformation; Unilateral Mistake.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## ORDER

At issue in this breach-of-lease suit is a tax adjustment clause whereby the federal government agreed to pay a proportionate share of yearly real estate taxes assessed against a building in which it leased office space. The clause required it to pay a share if the taxes were higher than the amount paid in the "base year" of the lease. We previously held that the base year was negotiated between the parties for all four leases to be the first full year of the lease. *Woodies Holding, L.L.C. v. United States*, No. 15-962, 2016 WL 6835540 (Fed. Cl. Nov. 18, 2016). The issue of the appropriate rate remains.

Plaintiff now moves for summary judgment on liability and damages because the leases plainly provided for defendant to pay a 12.98 percent share of the tax increases.[1] Defendant has cross-moved for summary judgment that the tax adjustment clause should be reformed to reflect a lower percentage because it was mistaken about the total rentable square footage in the building

---

[1] One of the leases was later amended to add additional space. Its percentage was thus higher. The final lease was for a much smaller area, and its percentage is much smaller.

when it entered the leases.  In the alternative, defendant asserts that the clause should be construed to only require it to pay the amount that it asserts was proper. The motions are fully briefed, and oral argument was held on December 4, 2017.

Plaintiff owns a ten-floor commercial building in downtown Washington, DC, known as the "Woodies Building."  It contains a basement and two above-ground retail floors; office space makes up the remainder of the approximately 500,000 square foot building. The General Services Administration ("GSA") entered into five separate leases with plaintiff for office space in that building, the latter four of which are at issue in this case. The first lease entered into by the parties, although not at issue in this suit, is where defendant alleges the mistake was introduced and copied in the subsequent leases.

Each lease corresponds to a floor of the building. The four leases at issue were for use by the Federal Bureau of Investigation ("FBI").  They are known as "lease 1751," "lease 1809," "lease 1838," and "lease 2154" respectively.  "Lease 1641," the first agreed to by the parties, was for use by the Environmental Protection Agency ("EPA").

The tax adjustment clause (clause 3.2), set out in the solicitation and later incorporated into the lease, obligated the government to "make a single lump sum payment to the Lessor for its share of any increase in real estate taxes during the lease term over the amount established as the base year taxes." *E.g.*, Pl.'s App. 1699 (lease 1751).  The opposite was also possible; if assessed real estate taxes decreased, the government would receive a proportionate share of that decrease as a credit against its rent.  The percentage to be paid or received was determined as a "ratio of the rentable square feet occupied by the Government to the total rentable square feet in the building . . . (percentage of occupancy)."  *Id.* at 1700. Clause 3.3 stated that the percentage of occupancy would be "established during negotiations."  *Id.* The final contract clause setting the percentage read as follows: "Pursuant to Paragraph 3.3 'Tax Adjustment', the Government's percentage of occupancy within the subject building for the purpose of calculating future Tax Adjustments as provided by the Lease shall be 12.98% and the total square building square footage is

2

determined to be 372,990 BOMA rentable square feet."[2] *E.g.*, Pl.'s App. 1654 (lease 1751).

Plaintiff asks the court to award it the amounts not paid by the government under the tax adjustment clauses plus interest under the Prompt Payment Act, 31 U.S.C. §§ 3901-3907 (2012). Defendant counters that it was mistaken when it entered into the leases as to the total rentable square footage of the Woodies Building. It believed that the square footage stated in the clause included retail space. Because it did not include that space, the percentage of occupancy used for purposes of the tax adjustment clauses was too high. It also alleges that plaintiff knew of its mistake or had reason to know of it because plaintiff supplied the correct information earlier in the lease formation process but signed the latter leases with the smaller number without notifying or seeking clarification from defendant. Defendant points out that the square footage information supplied by plaintiff after the first EPA lease was signed omitted the retail space, only reflecting the rentable office space. Defendant also opposes the application of the Prompt Payment Act to the claim at issue.

The court may reform a contract to correct a mistake when one party makes a mistake (1) as to a basic assumption on which the contract was formed, (2) that party did not bear the risk of that mistake, and (3) the other party had reason to know of or caused the mistake. *Johnson Mgmt. Group CFC, Inc. v. Martinez*, 308 F.3d 1245, 1260 (Fed. Cir. 2002) (citing the Restatement (Second) of Contracts § 153). The parties disagree as to each of the elements, and plaintiff argues further that defendant has not offered any evidence of a mistake of fact in the first instance.

Material issues of fact preclude granting summary judgment for either party. The individual who inserted the numbers into the tax adjustment clause on behalf of the government, Mr. Todd Valentine, was unclear as to how or

---

[2] The tax adjustment clause of lease 2154, the last entered into by the parties, reads slightly differently: "[t]he Government's percentage of occupancy for real estate tax purposes shall be 2.80% based on the 10,453 BRSF/372,990 BRSF." Pl.'s App. 1497 (lease 2154). "BRSF" stands for BOMA rentable square footage. "BOMA" is an acronym for the Building Owners and Managers Association, which sets a standard for measuring building square footage.

why those numbers appear in that clause but later swore in an affidavit that it must have been by mistake given that he now knows that the appropriate number for rentable square footage was 512,000 square feet.[3]  The various contracting officers involved all foreswore intimate knowledge of the facts of the leases or how these numbers came to appear in the tax adjustment clauses. They were all clear, however, that GSA's policy at the time, and still today, was to include retail space in the total for a building's rentable square footage.

Plaintiff's chief negotiator testified that he believed GSA to have chosen deliberately to use the smaller square footage number. He also testified that it was his recollection that GSA had a policy of excluding the retail square footage from rentable space calculations, or, at a minimum, that GSA acted inconsistently on that issue from lease-to-lease or time-to-time. He was thus not surprised when the first draft lease included the smaller number and had no reason to raise the issue with the government. Believing that number to have been chosen by the government, plaintiff submitted information for the subsequent leases using the smaller office-only square footage and omitted numbers for the retail space altogether.

The documentary evidence shows that, prior to lease 1641, plaintiff submitted accurate and complete information for the building on multiple occasions, including separate numbers for office and retail space and total rentable square footage including both. It is also clear that GSA's negotiator inserted the total rentable square footage number into the draft leases, but, as stated above, it is unclear why he used the number that he did. The information sheets submitted by plaintiff for the latter four leases did not include the retail square footage.  The documentary evidence does not fill the holes or clarify the disagreements between the parties' witnesses sufficiently to allow the court to rule in favor of either party on summary judgment.

It remains unclear at this juncture how or why the numbers that appear in the tax adjustment clauses were chosen. We also have conflicting testimony regarding GSA's practice at the time of the leases. The court will have to

---

[3] The case is different as to lease 2154. A different individual negotiated that lease for the government, Mr. Kirkland Williams, and his testimony at deposition was more clear that the numbers he used for the tax adjustment clause were supplied by Woodies and not taken or copied from earlier lease documents.

weigh the credibility of the witnesses' testimony on that issue. Defendant will have to prove each element of its defense by clear and convincing evidence at trial.

As to the application of an interest penalty under 31 U.S.C. § 3902, defendant is correct generally that it does not apply to any unpaid amount over which there is a genuine dispute. *See PCL Constr. Servs. v. United States*, 84 Fed. Cl. 601, 606-607 (2008).[4]  Plaintiff asserts, however, that there is no genuine dispute given the plain language of the contract.  We cannot go so far. The government has maintained since at least 2012 that the percentage of occupancy in the leases was incorrect. There was plainly a dispute over the proper amounts to be paid under the tax adjustment clause going forward. It is not clear from the record or the pleadings, however, why the government ceased making all tax adjustment payments, even the amounts that it considered due. We assume this was to recoup amounts it believed it had overpaid earlier, but that is not clear from the parties' papers. The issue of whether there are any amounts that are subject to the Prompt Payment Act thus remains open for trial.

Lastly, we must reject defendant's alternative argument that the court should interpret the tax adjustment clauses to require it to pay only the percentage of tax increases associated with the office space portion of the building. Defendant contends that Woodies' interpretation of the leases produces an unreasonable result and one not contemplated by the parties. Defendant points to the Business Improvement District ("BID") tax clause which specifically defines the percentage of occupancy to be the ratio of office square footage occupied by the government to the total office and retail space in the building. *See*, *e.g.*, Pl.'s App. 1703. The government argues that the two clauses are meant to operate the same way; thus the court should construe the tax adjustment clause to that effect. We disagree.

This argument, though couched as one of contract interpretation, is at heart another request for contract reformation. Absent a proven mistake or other problem that necessitates reformation to preserve the parties' intended bargain, the court is not at liberty to rewrite the tax adjustment clause at

---

[4] Should plaintiff prevail, interest on disputed amounts is available under the Contract Disputes Act's interest provision, 41 U.S.C. § 7109 (2012). *See George Sollitt Constr. Co. v. United States*, 64 Fed. Cl. 229, 304 (2005).

defendant's behest. The fact that the BID clause calls for a lower percentage payment to plaintiff than the tax adjustment clause is not cause to reform the contract. The BID clause is plain that retail space is included in the denominator of the fraction that forms the percentage of occupancy. The definition for the tax adjustment clause is different and does not make plain whether retail space is to be included in the denominator. The final clause in the signed standard form states a chosen percentage and a total office space that excludes retail space.  The result is not nonsensical, and thus, absent clear and convincing evidence that defendant was operating under a misapprehension of the facts and plaintiff knew or should have known about it, the court cannot rewrite it now.

The case must therefore proceed to trial on all remaining issues. Accordingly, the following is ordered:

1. Plaintiff's August 9, 2017 motion for summary judgment is denied.

2. Defendant's September 6, 2017 cross-motion for summary judgment is denied.

3. The parties are directed to file a joint status report on or before January 5, 2018, containing their joint proposal, or competing proposals, for a schedule leading to trial in early or mid-2018.


 s/ Eric G. Bruggink_____
ERIC G. BRUGGINK
Senior Judge