# In the United States Court of Federal Claims

No. 15-962C
(Originally filed: May 31, 2019)
(Re-issued: June 13, 2019)[1]

* * * * * * * * * * * * * * * * * * * *

WOODIES HOLDINGS, L.L.C.,

          *Plaintiff*,

v.

THE UNITED STATES,

          *Defendant*.

* * * * * * * * * * * * * * * * * * * *

Breach of lease; Tax adjustment clause; Real estate taxes; Base year; Reformation; Unliteral Mistake; Conscious ignorance; Knew or should have known; Contract Disputes Act; Prompt Payment Act.

*Lynn E. Calkins,* Washington, D.C., with whom was *Anna P. Hayes*, Washington, D.C., for plaintiff.

*Joshua A. Mandlebaum*, Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., with whom were *Joseph H. Hunt*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Martin F. Hockey, Jr.*, Deputy Director, and *A. Bondurant Eley*, Senior Trial Counsel, for defendant.

———————

OPINION

———————

BRUGGINK, *Judge*.

This case presents a dispute between Woodies Holdings, L.L.C. ("Woodies" or "plaintiff") and the United States, acting through the General Service Administration ("GSA"). The issue is whether GSA met its contractual obligation to reimburse Woodies for a portion of real estate tax

---

[1] Pursuant to the Protective Order issued in this case, this opinion was first issued under seal to afford the parties an opportunity to propose the redaction of protected information. Redacted material is indicated using brackets.

adjustments Woodies paid to the District of Columbia for a building in which GSA was leasing office space.    There is no dispute that GSA ceased remitting tax adjustment payments in 2012.    Defendant has counterclaimed for the amount it believes that it overpaid Woodies before it stopped making tax adjustment payments.    The government's principle defense is that it made a mistake as to the total size of the building in which it was leasing space when it agreed to the percentage of future tax increases that it would pay.    It asks the court to reform the contract to reflect the percentage that GSA would have agreed to had it not been operating under a misimpression as to the size of the building.    Trial was held over six days in June and July 2018 in Washington, DC.    We find no basis to reform the contract because defendant has not met its burden in proving a unilateral mistake of fact.

## BACKGROUND

This case concerns five leases between GSA and Woodies for office space in a commercial building in downtown Washington, DC known as the "Woodies Building."    The Woodies Building is a ten-floor mixed use building in which the basement and first two floors are outfitted for retail use, and the remaining floors are set aside for office space.    The building has approximately 500,000 square feet of usable interior space and occupies an entire city block.    The first lease, Lease 1641, was entered into by GSA for use by the Environmental Protection Agency ("EPA") and, although critical to this case, is not directly at issue in these two lawsuits.[2]    The four other leases, which are the subject of the two complaints, are referred to as Leases 1751, 1809, 1838, and 2154.    They were for use by the Federal Bureau of Investigation ("FBI"); each covered one floor of the building and ran for a period of 10 years.

The leases contain identical provisions for the sharing of property tax increases or decreases assessed by the District of Columbia ("DC") as the leases go forward in time.    Assuming an increase in local property taxes over the base year, these tax adjustment clauses require GSA to pay a percentage of that increase to Woodies.[3]    The general aim of the provision

---

[2] It is not at issue because GSA made all of the tax adjustment payments as requested by Woodies.

[3] We previously held in a related action that GSA and Woodies agreed upon a value to be used for the base year figure in the real estate tax adjustment

is that the percentage of increase to be borne by the government as lessee should be proportionate to its percentage of occupancy of the building. The parties differ, however, as to how to view this term in application—plaintiff views the formula used in the leases less as a product of mathematical precision and more the product of subjective negotiations, while defendant views it as the result of a purely mathematical exercise (creating an accurate fraction). As we discuss later, representatives of both parties testified to their respective understanding of how the formula was developed, pointing to different language in the contracts to support their views.[4]

Defendant cites the Tax Adjustment clause itself, which requires a straightforward application of a fraction to determine the percentage to be paid: The numerator represents the space leased by the government, and the denominator represents the total rentable space of the building. Leases 1751, 1809, and 2154 contain the identical provision: Section 3.2(F) of SFO No. 04-005, a government-drafted form, which was the solicitation that resulted in these three leases and was incorporated into the final contract. Before the figures were filled in, it read:

> The Government shall pay its share of tax increases or shall receive its share of any tax decrease based on the ratio of the rentable square feet occupied by the Government to the total rentable square feet in the building . . . (percentage of occupancy). For the purposes of this lease, the Government's percentage of occupancy as of the date hereof is _____ percent based on upon an occupancy of

calculation. *Woodies Holdings, L.L.C. v. United States*, 115 Fed. Cl. 204 (2014). That holding was applied to this case on summary judgment. *Woodies Holdings, L.L.C. v. United States*, No. 15-962C, 2016 WL 6835540 (Fed. Cl. Nov. 18, 2016).

[4] We have already held against defendant on its contract interpretation argument because there is no ambiguity or nonsensical result in the literal application of the as-written language; nevertheless, it is helpful to review the clauses and positions of the parties in this regard to understand the context in which the parties' arguments are made as it concerns defendant's defense of mistake. *See Woodies Holding L.L.C. v. United States*, No. 15-962C, 2017 WL 6381709, at *3 (Fed. Cl. Dec. 14, 2017).

        _____ rentable square feet in a building of _____ rentable square feet.

DX 44 at 48; DX 49 at 46; DX 51 at 48.[5]   In the government's view, the intention of the parties in this clause is plain: GSA would pay precisely the amount of increase equal to its percentage of occupancy of the building. Any deviation from the size of the leased space or the total size of the building must have been the product of some misrepresentation or mistake; the theory claimed at trial is one of unilateral mistake.

Plaintiff, on the other hand, calls attention to the very next section of the solicitation, Section 3.3, Percentage of Occupancy, which states that "[t]he percent of the building occupied by the Government, for purposes of tax adjustments, will be established during negotiations," which is precisely what plaintiff alleges was done.   *Id.*   In plaintiff's view, as its principals and agent testified, the percentage of occupancy was the subject and result of discussion between the parties about whether retail space was to be included in the total building size.

The figures inserted for the first three leases are 12.98% percentage of occupancy based on a "total building square footage . . . determined to be 372,990 BOMA rentable square feet."   *E.g.*, DX 44 at 2.   The space leased in all three of those leases was "48,410 BOMA rentable square feet." *E.g.*, *id.*   Lease 2154, a substantially smaller lease, had a percentage of occupancy of 2.8% based on only 10,453 rentable square feet.   DX 70 at 1-2.   Lease 1838 was later amended to upwardly adjust the percentage because the seventh floor was expanded, which added 6,680 square feet of rentable space, resulting in a new occupancy percentage of 14.77%.   DX 132 at 1.

The Woodies Building in actuality, if one includes both retail and office space, contains approximately 500,000 square feet of rentable space. Had that larger number been used in the tax adjustment clause, the government's percentage of occupancy would have been smaller, along with its share of tax increases.   Defendant thus urges that the numbers

---

[5] The final lease, Lease 2154, contains an identical provision, but it is found in SFO No. 07-014, a later solicitation, also incorporated into the lease contract.   DX 70 at 26.

used were a mistake and, because Woodies, as the owner, knew the real size of the building, reformation of the contract is appropriate.

Plaintiff avers the opposite: GSA selected the number initially used for total building size, and Woodies had no reason to think it was a mistake because its agent discussed the figure with GSA before the contract was signed. We turn now to the particulars of how these leases were entered into as the evidence was presented at trial.

I. GSA's AAP Process

In the early 1990s, GSA implemented a program to streamline its acquisition of leased space for government agencies during a time when demand was high from federal agencies, especially defense related agencies. GSA Contracting Officer ("CO") Jim Smale recounted that he was heavily involved in the efforts to come up with a more efficient and timely way to meet agency demand in the 1990s, which resulted in the creation of the Advanced Acquisition Program, referred to throughout the trial as the "AAP." Mr. Smale explained that the aim of the AAP was to have a stable of properties ready to be leased to the government without the need for separate solicitations and offers every time an agency need arose. The AAP "created an inventory of best and final offers that we could then draw down against space requests that would come into the agency." Tr. 26. The AAP resulted in an "annual inventory . . . where everything had been set and determined except for the size of the requirement and the location." Tr. 27. Once GSA received a request for space from a federal agency, it could compare the desired location and space required with its inventory in the AAP and find the best match for the best price. This process "could take place in a matter of days." *Id.* Mr. Smale was the original CO for the AAP once it was in place.

GSA would issue yearly solicitations for each general region, here the National Capital Region, in order to keep its inventory fresh and make sure that the status quo had not changed. Offerors could leave their offers open from year to year or they could refresh them to update prices or space offered; they were permitted to withdraw offers at any time throughout the year. Mr. Smale testified that the AAP was a great success.

Because the process was meant to complete up front as much as possible of the preliminary work necessary to identify whether a space met

agency needs, offerors were required to submit a significant amount of supporting documentation with their initial AAP offers.   This included, among other things: a Form 1364; a Form 1217 (Lessor's Annual Cost Statement," which included square footage information); as-built floor plans for each floor with "space not offered to government crosshatched and noted;" a BOMA Global Summary of Areas for the entire building "certified by a registered architect;" CAD files supporting the drawings; and any additional information necessary "in order for the government to perform a complete and adequate analysis of the offered property."   *E.g.*, PX 16 at 6-7 (SFO No. 02-001).

As offers came in, GSA reviewed them to determine if they met the solicitation requirements for that region.   Often the CO and/or other agency personnel would meet with qualified offerors to hold discussions regarding their offers.   Woodies' agent and attorney, Mr. Edward Gregorowicz, testified that he participated in many such meetings regarding the Woodies Building after he submitted offers on Woodies' behalf. These meetings would have been for the purpose of ironing out any missing details, reaching agreement on the numbers regarding square footage, answering GSA questions, and for encouraging offerors to lower their prices.   After these discussions, offerors submitted their best and final offers with the final price term no longer subject to revision.   Mr. Gregorowicz also testified that GSA's architects would confirm the square footage figures during this period and often discussed with Woodies' own architect the numbers to be used.[6]

Once an offeror was selected to meet an agency need, drafts would be circulated between the parties to iron out final details, such as riders concerning construction or improvements to be completed before handover of the property and the percentage of occupancy.   Mr. Smale testified that he relied on his lower level personnel at GSA to review all of the information provided by offerors and to verify its accuracy.

II.   Lease 1641

Although lease 1641 is not directly at issue in this suit, other than a two-year extension later negotiated by the parties, it is of critical importance

---

[6] Multiple GSA witnesses explained that this was only for the purpose of measuring the leased space, not the entire building.

because this is where what defendant characterizes as a mistake was first made.   This mistake was then repeated for the leases at issue.

A.   Woodies' Unsuccessful Offers

There were several unsuccessful offers made by Woodies in the years prior to Lease 1641's execution, and those offers provided accurate information regarding the building size to GSA.   In late 2000, GSA issued AAP solicitation No. 00-011 for office space in downtown Washington, DC.   Woodies, through its agent, Mr. Gregorowicz, submitted an offer to lease space in the Woodies Building.   Included in that offer was a completed GSA Form 1364.[7]   On that form, plaintiff detailed the building space as follows: Office Space of 316,420 BOMA rentable square feet ("BRSF"); Retail Space of 163,609 BRSF; and total building square feet of 480,029 BRSF.[8]   DX 4 at 13.   No lease resulted from this offer.

On October 12, 2001, GSA issued its yearly solicitation to refresh offers, SFO No. 02-001.   Mr. Gregorowicz again submitted an offer on

---

[7] Form 1364 is a standard GSA form in which offerors list general building information.   The look of the form and some of the information solicited by it changed throughout the years.

[8] Throughout the documents presented at trial, the standard of measurement for space varied greatly.   The only constant was the term "BOMA," which refers to the Building Owners and Manager Association, an industry group that seeks to standardize measurements in the real estate industry.   We saw terms such as "BRSF," "BOMA Office Usable SF," "BOMA Office Area square feet of office and retail space," and "BOMA office Area sq. ft."   We have come to understand that even BOMA regularly changes the precise definitions of the terms.   Further complicating matters, GSA promiscuously used the different terms to reference the same matter from document to document.   This led to some frustration during trial due to the imprecision that this necessarily created.   The testimony of Mr. Turowski, a former GSA Policy Director, was exhibit A.   He testified regarding a BOMA measurement that he recalled excluded retail space, but then the document from which he was testifying appeared to suggest otherwise, but we are unable to resolve that particular dispute because the entire document was not introduced.

behalf of plaintiff for space in the Woodies Building.   The Form 1364 for this offer contains similar figures as the prior year: 346,081 square feet of "general purpose" space and 146,778 square feet of "retail space."   DX 5 at 6 (initial offer); *see also* DX 6 at 8 (best and final offer for that year). This offer also did not result in a lease with Woodies.

B.   Success: Solicitation 02-019

In November 2002, GSA issued AAP solicitation No. 02-019. Woodies submitted its best and final offer on December 13, 2002.   The Form 1364 for that offer listed the available space as 372,990 BRSF for office space, 139,240 BRSF for retail space, and 512,230 BRSF "Total building square feet."[9]   PX 20 at WHL0005135.   The parties do not dispute that this was accurate information.   This time, the Woodies Building was selected for award of a contract to lease one floor of space for use by the EPA.

A contractor for GSA, Todd Valentine, was charged with finalizing the contract details with Woodies.     Although he did not possess authority to obligate the government, Mr. Valentine acted as the designee for the contracting officers involved in these leases.   He prepared the documents executed by the contracting officers.   It is apparent from their testimony that they relied on him to negotiate the particulars of leases and would have signed whatever he put in front of them.   In April 2003, Mr. Valentine sent several drafts of the lease to Woodies.   *See* DX 14 (April 18, 2003 cover email); DX 15 (April 30, 2003 cover email).   The cover emails attached to those drafts indicate that the lease needed some fine-tuning regarding construction that was yet to be completed by Woodies in the space.   There is no evidence that Woodies submitted any incorrect or incomplete information in these drafts regarding the building size.

Mr. Valentine testified that, at some point prior to the final signed lease, he inputted the 12.98% for the percentage of occupancy and the 372,990 total building square footage upon which the percentage was

---

[9] The relatively minor variance in these numbers across the Form 1364s was not of concern to the parties, nor is it of concern to the court.   Multiple witnesses explained that the variations resulted from changing measurements, changing definitions of how to measure space, and even changes to the space itself (additions and improvements).

calculated.   Tr. 243-44; *see* DX 20 at 2 (draft lease with changes tracked).[10]   He could not recount where those figures came from but did hazard a guess that he must have inadvertently selected 372,990 from one of Woodies' previously submitted Form 1364s (all of which contained accurate figures at that point in time).[11]   With 372,990 selected for the total building size, it was a simple math exercise to use the 48,410 BRSF as the numerator and come up with the fraction that equaled 12.98%.

Mr. Gregorowicz confirmed that the use of 12.98% in lease 1641 was not a separately negotiated figure.   In his eyes, however, no mistake was made because the exclusion of retail space from the total building size had been cleared ahead of time, both with Mr. Jemal on Woodies' end and with Mr. Smale (or other appropriate GSA employees) on the government's end.   We will discuss in more detail below the testimony of Mssrs. Valentine and Gregorowicz as it pertains to the theory of mistake.

After final reviews by both parties, lease 1641 was executed on June 24, 2003, by CO Don Brown at GSA.[12]   The percentage of occupancy stated was 12.98% based on a total building size of 372,990 square feet. None of the Form 1364s submitted by Woodies prior to execution were incorporated into the lease.   The Form 1217 that was incorporated into the lease listed 346,081 as the usable square footage for the building.[13]   All of

---

[10] The document admitted into evidence, DX 20, which shows tracked changes in an undated draft lease, does not make clear when the allegedly erroneous numbers were inserted.   Mr. Valentine was not questioned about the document.   Mr. Gregorowicz was, but he was not asked when he first saw those numbers from GSA; he did confirm that it was GSA that inserted the 12.98% and 372,990 figures into the lease.

[11] Plaintiff makes much of the point that Mr. Valentine never independently concluded that he had made a mistake until he was contacted by GSA counsel 13 years after the fact (lease 1641), who informed him that the leases used an incorrect total building size.   We do not view this fact as establishing a lack of mistake, but instead it suggests a relative lack of attention to the details of the transactions on which Mr. Valentine worked.

[12] Mr. Brown did not appear at trial, but we have his signature on the lease.

[13] "Usable" and "rentable" square footage are the result of different

the contracting officers who testified were consistent that they wholly relied on Mr. Valentine and others to review the offeror's supporting information. *E.g.*, Tr. 398-400 (Testimony of CO Larry Sutton that he totally relied on Mr. Valentine).   And, although Mr. Valentine agreed that it was his job to ensure the accuracy of any figures and to review all lease-related submissions prior to execution, he did not, in fact, review any of the numerous supporting documents originating from Woodies, such as the CAD drawings or the BOMA building summary.   Tr. 272-73, 278.   "I just – I did not review it.   We would typically rely on the square footage that's in the 1364 or 1217."   Tr. 273 (answering question regarding whether he reviewed the BOMA global summary of the Woodies Building). Mr. Valentine also testified that he could not recall ever having submitted supporting documentation to Mr. Brown or any other CO to review prior to signing the leases. *See* Tr. 295-97.

II.   Leases 1751, 1809 and 1838

After having successfully placed the EPA in the Woodies Building with lease 1641, both parties were interested in GSA leasing additional space in the Woodies Building.   GSA issued SFO No. 04-005 in early December 2003. Plaintiff submitted an initial offer later that month, again through Mr. Gregorowicz.   The Form 1364 attached to this offer used 356,081 and 314,462 for total usable and rentable square footage figures.[14] PX 22 at EVG001041.   The form also listed the building as comprised of "eleven" floors.   *Id.*   This iteration of Form 1364 did not have a box for retail space; instead there were boxes for "warehouse" and "other" space. Mr. Gregorowicz left those boxes blank.   *Id.*   The Form 1217 attached reflected that the entire building contained 346,081 square footage.   *Id.* at EVG001044.   Woodies submitted its best and final offer on February 26,

---

calculations at GSA.   Usable square footage excluded certain areas that were included in the rentable numbers.   The precise definition is unimportant for our purposes.

[14] We note that the 314,462 number is the same as that listed by Woodies as the total available usable square footage to be leased in the building on its cover page for its best and final offer.   *See* PX 23 at WHL0005223.   We infer that this number was smaller for the offers subsequent to lease 1641 because that floor was no longer usable space offered to the government for future leases.

2004.   It did not include an updated Form 1364 or 1217 for the Woodies Building, nor did Woodies reserve any exceptions to the solicitation.

SFO No. 04-005 resulted in three lease awards to Woodies, 1751, 1809, and 1838, each representing a single floor of the building for use by the FBI.   Mr. Valentine testified that he likely reused the tax adjustment figures from Lease 1641, although he could not be sure when looking at the redlined version of Lease 1751 or any of the others.   He could not have cut and pasted from any of the offer submissions from SFO No. 04-005 because this time Woodies did not use 372,990 as the total building size in either the 1364 or 1217 forms. Tr. 285-86.   He was sure, however, that he did not purposefully exclude the retail space from the total building size for any of those leases tax adjustment clauses.   Tr. 281, 287, 295.   He could not recall ever having done such a thing nor why he might ever have done it.

Lease 1751 was executed by CO Larry Sutton on August 3, 2004; Lease 1809 was signed on December 13, 2004; and Mr. Sutton executed Lease 1838 on March 7, 2005.   All three leases contain Mr. Valentine's figures of 372,990 for total building size and a percentage of occupancy of 12.98% in the tax adjustment clause.   DX 44 at 2; DX 49 at 2; DX 51 at 2. Mr. Sutton was asked what he believed the 372,990 number in those clauses represented at the time that he signed the leases.   As to all three, he believed that the number was the accurate total for all of the rentable square footage in the building.   Tr. 384-86.   He was also asked whether, at the time he signed the leases, he was aware that there was retail space in the Woodies Building.   His answer was "no."   Tr. 389.   His belief in the accuracy of these figures was based simply on the fact that they were in the lease.   *See* Tr. 384 ("Umm, based upon what I saw in the lease SF-2 of the documents, whatever that number was, I thought that was the total building square footage.").   As mentioned earlier, it was not Mr. Valentine's practice to submit any supporting information along with the lease documents to the CO, nor, in any event, was it Mr. Sutton's practice to review any such information.

On March 17, 2006, the parties executed a supplemental lease agreement ("SLA") to Lease 1838 which expanded the leased premises by 6,680 rentable square feet.   DX 132 (SLA No. 1 to Lease 1838).   The tax adjustment clause was upwardly adjusted to account for the additional space to a 14.77% figure based on the same 372,990 total building size. *Id.* at 2. This SLA was executed by CO, and former AAP manager, Santoni Graham

at GSA.   He, like Mr. Sutton before him, testified that he believed that 372,990 represented the size of the entire building.[15]   Tr. 465-66.   He did not know who inputted those figures into the SLA that he signed, but he surmised on the stand that it must have been a realty specialist.   He, again like Mr. Sutton, did not recall having reviewed any of the lease paperwork or submissions from Woodies prior to signing the SLA.

IV.   Lease 2154

On May 1, 2009, GSA issued SFO No. 07-014 under the new Automated Advanced Acquisition Program ("AAAP"), which was an update to the AAP which took the program into the digital age.   Offerors now submitted their offers electronically, and GSA's AAAP software calculated and ranked their prices automatically.   Under the AAAP, offerors could submit new proposals or update existing offers on a rolling basis during the first and seventh day of every month.[16]   Tr. 512 (Williams).

Plaintiff submitted its response to SFO No. 07-014 on July 9, 2009. DX 64.   Mr. Gregorowicz testified regarding the process that he undertook to submit an offer through the AAAP.   Rather than submitting electronic copies of documents, such as Forms 1364 or 1217, the AAAP process was

---

[15] There was a later SLA for lease 1838 that reverted to the prior 12.98% figure for percentage of occupancy.   *See* DX 132.   CO Santoni Graham was unsure how or why that figure was used after the lease was specifically amended to add more space with SLA No. 1.

[16] The government states in its briefing, citing Mr. Williams' testimony regarding the rolling basis of AAAP offer submissions, that formal discussions were no longer held under the AAAP program.   Although we are unable to infer the same from Mr. Williams' testimony, it is not a point disputed by plaintiff.   We also note, however, that Mr. Lynch, a GSA contractor who worked as an AAAP project manager during this time, testified that offerors would regularly call the project managers to discuss how to input their offers into the AAAP.   Tr.   1298-99.   Plaintiff points to this open nature of communications between GSA and offerors as representing no great departure from the prior period when formal discussions were held between initial and final offers under the AAP.

such that offerors were asked questions via an online portal and then the AAAP system populated the GSA forms with their answers. *See* Tr. 760-64. Because the AAAP system afforded no opportunity to upload documents, plaintiff did not submit a BOMA chart or other documents that might have contained the full figures for the Woodies Building's total size as they had done previously under the AAP.[17]   Tr. 772 (Gregorowicz).

Mr. Gregorowicz explained, however, that, given the parties' prior use of 372,990 for the total building size, when answering a question regarding the building size, he "followed up with a phone call to the GSA person who [he] knew was handling this to explain why [he] did it."   Tr. 773.   He was sure that the person at GSA with whom he spoke concerning the issue of total building size was a male, and, although he was not completely sure who it was, he stated that it was most likely Kirkland Williams. *Id.* He further recounted that, when the lease came back for Woodies' signature, it "reflected 372,990 for tax purposes, which is what the previous four leases had, so in my mind, I asked the question and they answered it by sending out the lease that way." *Id.* (answering the court's question whether he received a response to query whether the CO would accept 372,990 for the total building size).

Kirkland Williams, the GSA AAAP program manager at the time, testified that he reviewed AAAP submissions and handled finalization of the lease with Woodies. Tr. 514, 522, 530.   The resulting Lease 2154 used 372,990 for the total building size, which resulted in a 2.8% figure used for the percentage of occupancy, reflecting the significantly smaller lease on the eighth floor (10,453 BRSF).   Mr. Williams testified that he believed the 372,990 number was accurate because that is what was present in the Forms 1364 and 1217 generated by Woodies' AAAP submission.[18]

---

[17] Mr. Gregorowicz also testified that he believed that he had submitted CAD drawings for the entire building on a disk along with BOMA figures for the building.   Unlike submitting an offer under the AAP, he testified that he did not physically deliver these documents to GSA along with the offer, which was another reason prompting him to call GSA to discuss the issue.   Tr. 774.   Defendant points out that no supporting documentation was submitted at trial containing the accurate information for the entire building.

[18] Another GSA employee, Mr. Gregory Otten, testified, however, that, as

He did not recall having spoken with Mr. Gregorowicz about the total building size, but when asked by the court whether he recalled speaking with Mr. Gregorowicz about the deal generally, Mr. Williams confirmed that he spoke with him multiple times about the Woodies Building during the lead up to lease 2154's execution.   Tr. 538.   He also confirmed that he was aware, at the time, that the building had 11 floors and that the seventh floor contained approximately 48,000 square feet, as confirmed by GSA's architect Wendy Coonin.   But, Mr. Williams was not concerned with the building size at the time, nor did he ask Ms. Coonin to tally the floors and confirm the building size.   Tr. 557.

Lease 2154 was executed on May 19, 2010, by CO Michelle Parrish for GSA and Mr. Jemal for Woodies.   Ms. Parrish was aware that the Woodies Building contained retail space.   Tr. 573.

V.    Two-Year Extension of Lease 1641

Lease 1641, signed in 2003, had a 10-year term.   As the expiration of that term approached, Woodies began inquiring of GSA whether it, and by extension the EPA, were interested in extending the lease.   Brian Sullivan, a real estate broker representing Woodies, sent an email with an offer to extend the lease in June 2013 to Marcia Parkes, the GSA CO handing lease 1641 at the time.   *See* DX 197.   Woodies desired to enter a long-term extension; GSA desired a short-term extension.   Tr. 858 (Parkes).   This prompted a series of offers from Woodies that narrowed the lease term and upped the rental rate to account for the shorter duration.   *See* DX 199; DX 208; DX 215.   Ms. Parkes testified that the size of the Woodies Building was not an issue during these negotiations.   The percentage of occupancy figures were adopted from the original lease.   No solicitation or supporting documents (GSA forms or BOMA charts) were exchanged.   Tr. 866-67 (Parkes).   Mr. Sullivan did state in an email during their correspondence regarding the price per square foot that Woodies was paying approximately $4 million in taxes "for the 372,990 BRSF building."   DX 218 at 2.   She recounted that Mr. Sullivan was using that information to justify an increase from $43.21 per rentable square foot to $48 per square foot in the extension.   Tr. 861-62.   She testified

---

of 2014, Mr. Williams told him that he did not know where the total building size number had come from.   Tr. 1023-24.

that she believed those figures represented the entire building and had no reason to think that they excluded retail space.

Ms. Parkes, however, twice requested and received CoStar reports for the Washington, DC area, one of which included the Woodies Building and reflected accurate total size information regarding the building.[19] She explained that she requested the reports in order to check the rental rates for comparable buildings in the area, but she did not notice that the total size represented for the Woodies Building was 524,201 square feet. Tr. 905-906; DX 203; DX 206 at 7 (CoStar reports).   As she explained, she was only interested in what the report revealed for rental rates for other comparable commercial buildings in the area in order to compare with what was being offered by Mr. Sullivan on behalf of Woodies for the lease extension.

In February 2014, Mr. Sullivan sent a draft SLA to extend the lease. Ms. Parkes reviewed it, made minor edits—none to the tax adjustment clause—and circulated the draft SLA to others at GSA prior to execution. One document attached to that draft was a General Building Information Attachment for the Woodies Building, which stated that the building had 10 above-grade floors, included the square footage for each floor, and summed them up:   the "gross area of the building is 516,331 square feet total." PX 74 at USC-CC-00688.   Ms. Parkes had no recollection of that particular document on the stand, but the parties agree that it was sent by her as an attachment to the draft lease extension.

On March 6, 2014, Ms. Parkes signed Lease 1641 SLA No. 32, which extended the lease for two years; Mr. Jemal signed on behalf of Woodies.   PX 73.

---

[19] CoStar is a provider of commercial real estate information; the CoStar database is its main product.   As Ms. Parkes explained, it is a tool that building owners use to market their properties by keeping an up-to-date profile for commercial buildings in the database.   Tr. 874.   All the witnesses in this case were familiar with the database, had access to it, or could obtain access to it through other persons.   Ms. Parkes requested the report for the Woodies Building from her Branch Chief, Roger Perrault. Tr. 903.

VI.   GSA Discovers The Issue

From 2008 to 2012, GSA made tax adjustment payments to Woodies as invoiced by Woodies for the leases at issue.   The GSA employees who authorized those payments relied on the figures stated in the leases.   All testified that it would have been beyond the scope of their duties to independently verify information (other than that on the face of the contract) after lease execution.[20]   GSA used SLAs to authorize each of the tax adjustment payments. [21]   GSA stopped making tax adjustment payments on all of the leases as of December 13, 2012, after Woodies filed suit in an earlier action challenging GSA's use of a base year different than that agreed upon by the parties.   PX 72 (email from CO Berelson to Woodies); Tr. 1090-91 (Berelson); *see Woodies Holdings, L.L.C. v. United States*, 115 Fed. Cl. 204, 212-15 (2014).

In 2014, Gregory Otten, a GSA lease specialist, began working on arrangements for the FBI leases in the Woodies Building as they neared their conclusion (leases 1751, 1809, and 1838).   The idea was to extend all three leases so that they would have the same end date to simplify follow-on procurements. Tr. 956 (Otten).   In March or April of 2014, Mr. Otten noticed that the total building size stated on those leases was inconsistent with what he had seen advertised online.   Tr. 955, 1015, 1019.   Mr. Otten thus asked for and received a CoStar report for the building and verified that it was larger than stated in the leases.   Tr. 1024-25.   He also took the initiative to try to track down the original supporting documents submitted

---

[20] The same was heard uniformly from GSA employees working on contract formation for these leases.   (With the exception of Mr. Otten, *infra*.) None felt they had the time or took the initiative to check the accuracy of any figures.   All of the contracting officers testified that they relied on their contract specialists to ensure accuracy.   Lower level employees all stated that they relied on the offerors to submit accurate information and that it was never their practice to independently verify offer information.

[21] GSA employee testimony was uniform that these were unilateral SLAs and did not require a signature from Woodies.   Woodies own copies of those SLAs are signed.   The parties differ as to the relevance of this fact. It does not matter to our ultimate conclusion, however.

by Woodies for the three leases but was unsuccessful because those documents had already been sent to the National Archives.   Having verified the accurate building size, Mr. Otten ensured that the new leases included "504,221 BRSF" for the total building size in the tax adjustment clause.   *E.g.*, PX 85 at 7 (¶ 1.13).

After Mr. Otten reported his findings to GSA management, he was asked to prepare a spreadsheet to compare what GSA paid to what it believes it should have paid.   This information was provided to the contracting officers who worked on the certified claims submitted by Woodies for each of the leases.[22]   PX 249, PX 250, PX 251, PX 252 (certified claims).   GSA denied each of those claims.   DX 175, DX 176, DX 177, DX 178, DX 180, DX 181, DX 182 (claim denials).

VII.   Plaintiff's Prima Facie Case

It is plaintiff's burden to first prove its entitlement to damages.   We find that it has.   The tax adjustment and Business Improvement District ("BID") tax clauses are unambiguous.[23]   They required GSA to reimburse Woodies 12.98% of any increase in those taxes over the base year.   The base year is not at issue.

---

[22] Mr. Otten's spreadsheets were also provided in discovery to plaintiff. This is relevant to when plaintiff received notice of the government's claim of overpayment.   Given our conclusion, however, that defendant has not proven the defense of unilateral mistake, the issue is moot.

[23] Defendant believes the interpretation of the BID clause was still undecided at the time of trial.   To the extent our prior order was unclear in that respect, we iterate here that the clauses are nearly identical, use the same percentage of occupancy, and operated in the same way.   Although the BID clauses state that retail space is included in the denominator, we do not read the BID clause any differently than the real estate tax adjustment clause.   Treating the clause as written produces neither an unconscionable nor a nonsensical result.   *See Woodies*, 2017 WL 6381709, at *3.   Only if the clause is reformed will defendant be relieved of its contractual duty to reimburse plaintiff for the stated share of BID tax increases.

Plaintiff established at trial that it timely submitted invoices for the tax adjustment clauses based on the percentage stated in the leases. Ms. Shaala Motamedi of Woodies testified regarding her role in preparing and sending those invoices.   Joel Berelson, a GSA CO, agreed and testified that Ms. Motamedi timely sent him invoices for lease 1751 payments.   The parties thereafter stipulated as to the timeliness of the rest of the unpaid invoices for the other leases.   *See* Tr. 1093-94.[24]   There is no dispute that those invoices were not paid.

Plaintiff also presented the testimony of its expert Cristal Brun. Ms. Brun was qualified by the court as an expert in forensic accounting and economic damage analysis.   Tr. 1604.   Ms. Brun reviewed the lease documents, invoices from the DC city government to Woodies, Woodies' invoices to GSA, and tax refunds received by Woodies from DC.   She then reconciled the lease years with the DC fiscal year and determined the yearly increase of taxes over the base year for each lease.   Next, she applied the stated percentage of occupancy to each of those figures.   To the resulting sums, she netted out Woodies' tax refunds from the city.   The remainder was GSA's share of tax increases to be reimbursed under the BID and tax adjustment clauses.

Ms. Brun then applied prompt payment interest for one year and then simple interest thereafter on each amount.   She added these sums to the balance due for each lease as of April 25, 2018.   The last step of Ms. Brun's calculus was to calculate a daily interest rate for each of those amounts that can be applied to bring them forward to the date of judgment. It should be noted that Ms. Brun also calculated what the sums would be if prompt payment interest were not available.   The figure, with prompt payment interest, as of April 25, 2018, was $3,427,515.96 for all leases. Tr. 1658-59.   None of this testimony was controverted and, other than the applicability of prompt payment interest, not disputed by defendant, except for its affirmative defense.   We consider the issue of interest later, but otherwise find that plaintiff has proved a claim for damages for unpaid tax adjustment payments.

---

[24] The invoices themselves are also in evidence: PX 90 to PX 97 for lease 1751; PX 98 to PX 105 for lease 1805; PX 106 to PX 114 for lease 1838; and PX 115 to 20, PX 122 to 152, and PX 139-145 for Lease 2154.

DISCUSSION

We are thus presented with plaintiff's established claim for approximately $3.5 million plus additional interest to the date of judgment. In the absence of an affirmative defense, it is entitled to judgment. Defendant's answer is that Todd Valentine, and later Kirkland Williams, were mistaken when they inputted 372,990 square feet into the leases as the total building size for the BID and tax adjustment clauses.   Defendant also avers that Mr. Jemal, Woodies' principle, and Mr. Gregorowicz, Woodies' agent, were aware of this mistake when lease 1641 was entered into and subsequently for each of the other leases as well.   The government thus asks the court to reform the contracts to correct those provisions to reflect an accurate percentage of occupancy.   Defendant has also counterclaimed for amounts it believes it overpaid prior to ceasing payment in 2012.

Reformation of a written contract is an "extraordinary remedy." *Nat. Australia Bank v. United States*, 452 F.3d 1321, 1329 (Fed. Cir. 2006). It is generally only available on a showing by clear and convincing evidence that the intent of the parties is not expressed by the written instrument, which is to say that the parties both made the same mistake of fact.   *See id*. "Reformation will not be granted, unless the proof of mistake be 'of the clearest and most satisfactory character.'"   *Philippine Sugar Estates Dev. Co. v. Gov't of Philippine Islands*, 247 U.S. 385, 391 (1918) (quoting *Snell v. Atlantic Fire & Marine Ins. Co.*, 98 U.S. 85, 89 (1878) (explaining the common law standard of clear and convincing evidence necessary to reform a contract)).   Where, as here, the mistake alleged is not mutual, the law requires the unmistaken party to have known, or have had reason to know, of the other party's mistake.   *Burnett Elecs Lab., Inc. v. United States*, 202 Ct. Cl. 463, 479 (1973).   Otherwise, reformation on the basis that only one party made a mistake is unavailable.   *See Cheyenne-Arapaho Tribe of Indians v. United States*, 671 F.2d 1305, 1311 (Ct. Cl. 1982); *Horn & Assocs. v. United States*, 104 Fed. Cl. 121, 131 (2012).[25]

---

[25] *Cheyennne-Arapaho* and a line of similar earlier cases out of the Court of Claims generally held that unilateral mistake will not support a claim for reformation.   *Cheyenne-Arapaho*, 617 F.2d at 1311-12 (citing *Callen v. Penn. R. R. Co.*, 332 U.S. 625, 630 (1948)); *Albano Cleaners, Inc. v. United States*, 455 F.2d 556, 560 (Ct. Cl. 1972); *Allied Contractors, Inc. v. United States*, 310 F.2d 945 (Ct. Cl. 1962).   This rule was followed by the Federal Circuit in *American Employers Insurance Co. v. United States*, 812 F.2d

Thus, defendant must show by clear and convincing evidence that GSA 1) made a mistake, not having borne the risk of that mistake, as to a basic assumption on which it made the contract; 2) that its mistake had a material effect on the agreed exchange of performance; and 3) either the result is unconscionable, or Woodies knew or had reason to know of it. *Johnson Mgmt. Group CFC, Inc. v. Martinez*, 308 F.3d 1245, 1260 (Fed. Cir. 2002) (citing the Restatement's formulation of the test for unilateral mistake); *Woodies*, 115 Fed. at 214 (citing *Northrop Grumman Corp. v. United States*, 47 Fed. Cl. 20, 91 (200).

I.   GSA Was Mistaken in Leases 1641, 1751, 1809, and 1838

The first element that defendant must prove is that GSA made a mistake that it did not bear the risk of and that the mistake went to a fundamental assumption on which the contract was made.   We first examine leases 1751, 1809, and 1838.   Lease 2154 is treated separately.

A.   Todd Valentine Made a Mistake

Mr. Valentine testified that, although he could not specifically recall how or why, he made a mistake when inserting the 372,990 figure into the tax adjustment clause of Lease 1641.   He does not recall specifically where he pulled that number from, and he confirmed that Woodies' submissions leading to lease 1641 contained accurate information for the total building size.   He made a reasoned guess, when asked during trial,

---

700, 705 (Fed. Cir. 1987) (holding that fraud or misrepresentation is necessary to overcome the presumption against reformation for a unilateral mistake).   An exception to this rule in the Court of Claims was allowed in the case of mistaken bids, where the winner of a contract with the federal government alleged that it was, in essence, taken advantage of when the Contracting Officer knew of a mistake that the bidder had made but accepted the offer anyway.   *E.g.*, *Wender Presses, Inc. v. United States*, 343 F.2d 961, 962 (Ct. Cl. 1965).   This court has followed that line of cases, citing the modern restatement's formulation of the test.   *E.g.*, *Nat. Rural Utils. Co-op Fin. Corp. v. United States*, 14 Cl. Ct. 130, 141 (1988) (citing Restatement (Second) of Contracts § 153 (1981)).   This includes adopting it as an affirmative defense to a contractor's breach claim.   *See*, *e.g.*, *Ameriserv Tr. v. United States*, 125 Fed. Cl. 733, 747 (2016).

that he pulled that number from the Form 1364 submitted by Woodies and had not realized that the figure was for office space alone despite the fact that significant retail space was reflected in close proximity on the same page of the document.   *See* DX 5 at 6; DX 6 at 8.   Nowhere else does that figure appear in the documents that lead to lease 1641.   Neither he nor anyone else at GSA who reviewed the lease prior to its execution caught the error.[26]   The initial mistake was then replicated for leases 1751, 1809, and 1838.   Mr. Valentine testified that he cut and pasted the 372,990 figure from lease 1641 into those leases since they were all virtually identical contracts (each covering an identical floor of the building).   It was not his testimony that he relied on Woodies' separate submissions for those leases in selecting the smaller total building size number for the subsequent leases. We thus find no affirmative misrepresentation on Woodies' part.

Defendant points to the testimony of each of the GSA personnel involved with these leases that, as far as they knew, GSA had never knowingly excluded retail space from an office space lease.   Each was also asked whether they knowingly chose to exclude the retail space from the leases at issue.   That answer was also uniformly "no."   They all believed that 372,990 represented the entirety of the building.   Tr. 384-86, 389-91 (Sutton discussing leases 1751, 1809, and 1838); Tr. 465-66 (Graham discussing SLA No. 1 of Lease 1838); Tr. 518-20 (Williams discuss lease 2154); Tr. 569-70, 572 (Parrish discussing lease 2154); Tr. 851 (Parkes discussing SLA No. 32 for lease 1641).   Further, 10 current and former GSA employees affirmatively stated that GSA's policy or practice had been to include retail space.   Tr. 246-47 (Valentine); Tr. 389, 393-94 (Sutton); Tr. 439, 459 (Graham); Tr. 532 (Williams); Tr. 569-70 (Parrish); Tr. 844 (Parkes); Tr. 962 (Otten); Tr. 1070 (Berelson); Tr. 1300-1303 (Lynch); Tr. 1351 (Mowery).

---

[26] Testimony at trial established that the leases were, or should have been, reviewed by GSA attorneys, by the Data Accuracy Group within GSA, and by the COs who signed them prior to execution. These individuals all—save Mr. Otten—testified, however, that it would have beyond the scope of their duties, or beyond their ability due to workload, to confirm or verify any information provided in the standard lease forms.   Thus, the proverbial "buck" gets passed down to Mr. Valentine as the only person who testified that he handled the papers submitted by Woodies.   Everyone else simply assumed that someone else with more time and attention had done so.

Plaintiff attempted to cast doubt on these GSA statements by asking Mr. Gregorowicz, who had been a GSA attorney prior to his private practice, whether GSA ever purposely excluded retail space from its calculation of total building size.   Mr. Gregoworicz testified that there was no uniform policy and that it was dealt with on a "case by case basis."   Tr. 641.   This testimony was echoed by Arthur Turowoski, a former GSA Director of Leasing Policy and Performance for the National Capital Region.   We accepted him as an expert in GSA federal leasing policy and practice.[27]   Tr. 1475.   Mr. Turowoski testified that GSA did exclude retail or other space from total building size calculations when it made sense to do so.   If a building had a portion that had little value or that would not function as office space, it might be excluded from the percentage of occupancy calculation.   Tr. 1481-88.   There was no set policy against excluding portions of a building, and GSA handled buildings on a "case by case" basis, was Mr. Turowski's recall.   Tr. 1488.

Although we are presented with conflicting testimony regarding GSA's policy at the time, GSA witnesses were unanimous in stating that they had not knowingly excluded the retail space from the percentage of occupancy calculation in these leases and none of them were aware of the mistake prior to Mr. Otten's discovery.   We found this testimony credible, and it was unrebutted.   We thus find that there was a mistake made by GSA in lease 1641, including the two-year extension, which was repeated in leases 1751, 1809, and 1838.   We will treat lease 2154 separately below.

B.   GSA Bore the Risk of That Mistake

Plaintiff argues that GSA bore the risk of that mistake by consciously disregarding information that it had at hand.   There is no question that Mr. Valentine and all of his superiors at GSA had readily available to them the accurate building size information submitted by Woodies prior to executing lease 1641.   Although the forms submitted along with Woodies'

---

[27] Although we accepted Mr. Turowoski as an expert, his testimony on the matter was more in the nature of a fact witness.   He was the director at the time these leases were entered.   He did not specifically work on the leases at issue, but his testimony regarding the general policy of GSA is something of which he had firsthand knowledge rather than as expert opinion after the fact.

subsequent offers for the other leases used only the 372,990 number, Mr. Valentine testified that he simply copied lease 1641 for those leases.   In addition, other supporting information with those offers contained accurate figures for the entire building.   Thus, GSA was not led astray by an affirmative misrepresentation by Woodies in the later leases.

Plaintiff also argues that Mr. Valentine, and each of the contracting officers after him, could have checked CoStar and any of Woodies' submitted building information (BOMA charts and Fire Safety Documents) that contained the accurate total size.   They all admitted so on the stand. Indeed, Mr. Otten demonstrated that it was relative child's play, assuming one were curious, to discover the error.   In addition, plaintiff points out that many of the GSA personnel directly involved toured the Woodies Building—Mr. Valentine on multiple occasions—and could not have missed the fact that several floors were reserved for retail tenants.

We also accept Mr. Gregorowicz's testimony that he would have had a discussion with someone at GSA about whether to include retail space in the figures for total building size when the SFO form changed, first, specifically indicating that retail space included in total size, and later, when a revised SFO 00-011 omitted any reference to retail.   *See* Tr. 684-85.   *Compare* PX 13 at EVG-002195 (§ 2.4(e)) (original SFO 00-011) *with* DX 3 at 5 (§ 2.4(f)), 24 (§ 2.4(f)) (revised SFO 00-011).   All of the subsequent SFOs at issue here also omitted any reference to retail space when referencing the total building size for tax adjustment purposes.   *See* PX 16 (SFO 02-001); PX 19 (SFO 02-019); PX 21 (SFO 04-005); DX 63 (SFO 07-014).   Mr. Gregorowicz testified that the lines of communication were open between him and Mr. Smale during this time frame and that this was something that he would have raised with GSA before submitting a final offer.   Tr. 685-86.   When asked during trial how he would have read the revised SFO 00-011's tax adjustment clause, Mr. Gregorowicz testified that he would have read it as including office space only.   Tr. 685.

In plaintiff's view, the court should view GSA's practice with these leases as having assumed the risk of conscious ignorance of relevant information regarding the size of the Woodies Building.   Defendant responds that there is no evidence of a risk allocation to the government either in the contract itself or in the government's conduct.

23

The Restatement instructs that, to establish the defense of unilateral mistake, the asserting party must show that it did not bear the risk of that mistake, either by having allocated that risk to itself in the contract or by proceeding despite being aware that it had only limited knowledge about the facts related to the mistake.   Restatement (Second) of Contracts § 154 (1981).   Plaintiff points to the second prong, arguing that the lack of diligence of GSA employees and the fact that Woodies submitted all the information necessary before lease 1641 was executed are sufficient to show that GSA disregarded its limited knowledge of the facts of the building.   In substance, we agree with plaintiff.   Although, in this instance, the government had all the information it needed, it simply moved forward without paying attention to it.

The record is clear that Woodies presented accurate information to GSA prior to the execution of lease 1641.   It is also clear that no one at GSA was particularly concerned with the tax adjustment provision (nor the total building size).   Despite the significant potential impact of tax increase allocations, GSA's focus was exclusively on rental rates.   Todd Valentine stated that he would have reviewed some of the information relevant to the tax adjustment clause, the Form 1364 and 1217, but other supporting information, such as BOMA charts and general building information sheets, he did not review.   Tr. 273.   He also did not review any information about the Woodies Building in CoStar despite being very familiar with it, having worked for CoStar previously.

To be sure, box 3(a) on the Form 1364 submitted by Woodies along with its offer lists 372,990 for the office space.   As discussed above, we can infer, as Mr. Valentine did on the stand, that is the source for the figure for total building size.   Woodies' Form 1217 also listed only 346,081 as usable square feet for the building.   Although Mr. Gregorowicz discussed why that number was used, as we will treat in more detail below, the presence of that number in the Form 1217 is consistent with using 372,990 for the total rentable size of the building because "usable" square footage was always smaller than "rentable" square footage. The genesis of the mistake is thus understandable, but that does not excuse GSA's negligence in wholly relying on Mr. Valentine, who ignored multiple sources of accurate information that would have disabused him of his notion that the building was only 372,990 square feet in total.   Further, when asked about why the smaller numbers used did not ring any alarm bells for him, Mr. Valentine admitted that using the 372,990 and 346,081 figures would result

24

in a "core factor" of roughly seven percent, an unusually efficient result for a building of this type.[28]   Tr. 366.   When asked whether that should have "been a big red flag" if he believed those numbers to be accurate, Mr. Valentine affirmed that such a core factor should have alarmed him.   *Id.* ("definitely, yeah").

Woodies' submissions in response to SFO No. 00-011 included BOMA charts, a building summary, fire safety information, and CAD drawings, all of which included accurate total building size numbers.   All of the SF-2s and Form 1364s also included that information, although some minimal arithmetic might have been necessary depending on which page one viewed.   *Compare* DX 5 at 6 (box 3(a) plus box 3(c)) *with* DX 5 at 8 (listing separate figures for office and retail and a total figure of 512,230 BRSF).   Additionally, Woodies advertised the total building size on CoStar, which numerous GSA employees had access to and were familiar with.   This is too great a volume of accurate information to ignore, and yet that is what GSA did.

Mr. Valentine reviewed only a limited subset of Woodies' submission documents (Form 1364s and 1217s) and ignored many readily available sources of accurate information despite using total building numbers that, by his own admission, should have set off a red flag.   The contracting officers involved did not review the underlying lease documents nor did anyone else at GSA because they relied on Mr. Valentine having done so.   Those with authority to bind GSA legally were aware that they had no personal knowledge and had not reviewed any supporting information to confirm the accuracy of the figures to which they were binding the government.   No matter from whose perspective the facts are viewed, from Mr. Valentine's or from his superiors', GSA personnel were content to ignore accurate information provided by plaintiff.

In the final analysis, defendant's error was the result of Mr. Valentine's cavalier and careless approach to his work, compounded by the

---

[28] Mr. Valentine explained earlier in his testimony that the core factor of a building was the percentage of usable space against the rentable space. The lower the percentage, the more "efficient" a building was from the landlord's perspective.   Tr. 310-12.   In his experience, a typically efficient building had a core factor of 10 to 12 percent.   Tr. 311.   Thus, seven would have been an outlier.

equally careless oversight of his superiors, which in turn was facilitated by the agency's compartmentalization of tasks regarding lease development and oversight, as well as its constantly evolving forms and terminology. Numerous employees testified, in effect, that assuring accuracy, beyond merely looking at what the lease stated, was not in their job description. Only one of them, Mr. Otten, by exercising some diligence, was able easily to spot the inconsistency in the building size descriptions.   This is precisely the sort of "conscious ignorance," or gross negligence, that the law will not countenance when a party seeks to avoid its contractual obligations by claiming it was mistaken.   *See* Restatement (Second) of Contracts § 154, cmt. c; *see also Griffin & Griffin Exploration, LLC v. United States*, 116 Fed. Cl. 163, 175 (2014).

C.   The Total Building Size Was a Basic Assumption

Lastly, with regard to this issue, defendant must establish that the mistake concerned a basic assumption upon which the contract was formed. Defendant argues that the tax adjustment clause is part of price, which is always part of the basic assumption on which a contract is made.   We agree.

Plaintiff argues that, because the tax adjustment provision was not set until after Woodies had been selected as an offeror, it could not have formed any part of the basis of the bargain between the parties.   We disagree.   An additional payment from one party to the other, even if its accuracy is not of particular concern to one party, is part of the price term of the lease.   The mistake as to the building's total size does go to a basic assumption on which the deal was struck because it was relevant to the total price, after the operation of tax adjustment clauses, that defendant would ultimately end up paying for the lease.    Thus we conclude that, as to leases 1641, 1751, 1809, and 1838, defendant made a mistake, as to which it bore the risk, with respect to a basic assumption on which the contract was made.

D.   Lease 2154

We reach a different conclusion as to lease 2154.   For this lease, we find no mistake in the first instance.   We find credible Mr. Gregorowicz's testimony that he called someone at GSA, most likely Mr. Williams, to discuss the building size because he had previously omitted retail space. Although, at trial, Mr. Williams did not recall having spoken with Mr.

26

Gregorowicz, he did confirm that the AAAP produced forms that included zero for retail space in the Woodies Building.

Mr. Gregorowicz's testimony on the matter was direct and credible, and it comports with his earlier testimony that he would have called GSA to discuss the changes in the SFO when it omitted a reference to retail space. His testimony was also in harmony with that of Mr. Lynch, who testified that, under the AAAP, the lines of communication between offerors and the agency were open.   Mr. Gregorowicz was an experienced real estate attorney with significant experience as an agent and attorney dealing with GSA.   His having keyed in on the importance of including, or not, the retail space for the Form 1364, and by extension for the total building size, is consistent with that experience.

We also find an inherent consistency in Mr. Gregorowicz's testimony regarding his actions relating to the issue of retail space across these leases.   He testified that GSA had no consistent policy of including it, that it was rare to see it in office buildings in the downtown DC area at the time, that he was concerned with it when saw a change in the SFO that excluded any reference to it, and was then concerned again when he was prompted to input total building size when submitting an offer under the AAAP.   It is no surprise then that Mr. Gregorowicz was concerned with the inclusion, or not, of retail space in 2009 for lease 2154 because, as detailed above, significant retail activity had begun by that point in the Woodies Building.[29]

Although we found Mr. Williams generally credible, his testimony was less specific.   His inability to recall having spoken with Mr. Gregorowicz does not rebut Mr. Gregorowicz's affirmative testimony on the point.   Mr. William's testimony that he believed 372,990 accurately reflected the total size of the building is also not directly contradictory to Mr. Gregorowicz's statement.   If the two (or someone else at GSA) had discussed not including retail space for the Woodies Building, then his answer at trial that he believed the number used in the lease to be accurate is not an indication that he was mistaken.

---

[29] We do note that Mr. Jemal testified that most of the value was in the office space even when lease 2154 was signed, but it is also clear that significant retailers were in place in the building by the time that lease was entered into.

We also know that the CO, Michelle Parrish, was not concerned with the accuracy of that number.   Although she testified that she never knowingly omitted retail space from a total building size, Tr. 569-70, she went on to admit that she was aware of the retail activity in the building, Tr. 573.   She was not alarmed, however, that Woodies' offer stated zero retail space because she recalled conversations that she had had with Mr. Jemal, and possibly Mr. Gregorowicz, regarding a separate tax assessment of the retail space from the office space in the building.   Tr. 574-76. Although she walked back her recollection regarding when these discussions took place, after a series of leading questions from her counsel, we think her testimony in this regard is instructive that she was not making a mistake when signing the lease with 372,990 listed for the total building size.[30]   Thus, we find, as to lease 2154, that defendant has not proven by clear and convincing evidence that GSA was mistaken when it entered that lease.

## II.   The Mistake Was Material

We hold that the mistakes as to leases 1641, 1751, 1809, and 1838 did have a material effect on the agreed upon exchange of performance. Having held that the tax adjustment clause and BID clause were part of the price term, it is undeniable that the mistake was material.   Having a higher percentage of occupancy than defendant would otherwise have agreed to, means that it paid a greater percentage of tax increases and thus a higher price overall.   That constitutes a material effect on the agreed upon exchange of performance.

---

[30] Although the office space and retail space never were separately assessed by the DC taxing authorities, this still shows a clear indication in Ms. Parrish's memory that there was something peculiar with this building as it regards the relationship between retail and office space.   This suggests to the court that she had reason not to be concerned with the omission of the retail space from the total building size and may have done so intentionally. Although we do not find that GSA affirmatively decided to do so, it is defendant's burden to establish the opposite, and as to lease 2154, we conclude that it has not.

III.   Woodies' Knowledge

We come finally to whether Woodies had knowledge of the mistake. In order for the defense to succeed, plaintiff, the unmistaken party, must have known of defendant's mistake or had reason to know of it. Defendant believes this factor is clearly established by the testimony of Mssrs. Jemal and Gregorowicz, both of whom admitted to knowing, at the time the leases were entered, that the Woodies Building was far larger than 372,990 of rentable square feet.   Thus, defendant asserts, they knew the government was stepping on a landmine and, instead of warning it, remained silent.   Plaintiff responds that Woodies, and more specifically Mr. Gregorowicz, believed that GSA had accepted that number for the total building size because it represented the office space in the building, the only space the lease was concerned with, and because Mr. Gregorowicz raised the issue with GSA prior to lease 1641 and again prior to lease 2154.

There is no dispute that Woodies knew the building's actual size was approximately 500,000 square feet, inclusive of retail, but Mr. Gregorwicz testified that he believed that GSA had changed the SFO to exclude retail space for the tax adjustment clause, and, not only did he believe that, but he would have also called or met with someone at GSA, likely Mr. Smale, to clarify.   The evidence on this point is close, but because defendant bears the burden to prove plaintiff's knowledge by clear and convincing evidence, we find that it has not met that burden.

A.   Leases 1641, 1751, 1809, and 1838

As stated above, when asked by defense counsel what he believed the tax adjustment clause to have meant when the revised SFO 00-011 was issued by GSA, Mr. Gregoworicz stated: "since there was no longer a reference to retail space in this, it could have been that they were going back to that definition of just office space."   Tr. 685.   It was his testimony that GSA had omitted retail space from the building size in the past.   He continued:

> But I will tell you this: I would have likely have called and/or spoken to the contracting officer about why there was a change and what the intent was.   I wouldn't have just relied on my own judgment for what it meant.   There was an open dialogue between myself and the contracting officer, not only

in terms of understanding these things, but in the discussion
we had between initial offer and best and final offer . . . .

*Id.*   The court then asked whether he had a specific recollection of noticing
that change and having a conversation with GSA about it.   He answered
that he could not specifically recall either "sitting here today all these years
later . . . , but when a document changed from what it was to this, it would
have certainly drawn my attention as to why it changed, and I am sure that I
would have followed up."   Tr. 686.

Balanced against that testimony we have GSA employees' universal
responses to the question of whether they omitted retail space purposefully
("no"), and no one involved with Lease 1641 could recall having spoken to
Mr. Gregorowicz about the issue, but all were sure that they would not have
omitted retail space.

The question that naturally arises when faced with these competing
recollections is what purpose the parties could have had in agreeing to omit
retail space.   Defendant naturally avers that it could not have had any
purpose in doing so.   Plaintiff, however, offered some relevant testimony
on the issue.   Mr. Gregorowicz was asked to explain the approach that he
took in filling out the Form 1217 (breakdown of lessor's costs) in response
to the SFO that led to lease 1641.   The Form 1364s submitted by Woodies
prior to lease 1641 all had included a breakdown of space that included
numbers for retail space.   On the Lessor's Annual Cost Statement,
however, Mr. Gregorowicz explained that he purposefully omitted the retail
space because retail tenants did not pay any share of the lessor's costs for
cleaning or utilities.   Retail lessees paid their own cleaning costs.   GSA
also required daytime cleaning operations in its leased space, which
represents a higher operating cost not shared by space rented to other
private entities.   Tr. 653-54.   Thus, in order to represent an accurate
figure for the costs per square foot to GSA, Mr. Gregorowicz purposefully
omitted the retail space.   Tr. 653-54, 790, 801-803.   He also testified that
he would have explained this to Mr. Smale because the presence of
significant retail space in the Woodies Building was different from the
normal experience at that time for GSA in the National Capital Region.
Tr. 803-804.

Excluding from the Form 1217 space that did not contribute to
Woodies' costs to operate the building, and especially the area to be rented

by the government, was important to plaintiff because, as Mr. Gregorowicz explained, GSA wanted to know what it would cost to operate the space that it would be renting.   The cost to operate was a component of the rent.   Tr. 652.   This was confirmed by Mr. Sutton.   Tr. 387 (stating that the purpose of the Form 1217 was to show the cost to operate the building and specifically the "GSA leased area on a square foot basis").   Retail space had a different cost and reimbursement structure.   It thus made little sense to Woodies to include it in the form 1217.   This is a plausible explanation, and we find Mr. Gregorowicz to be a credible witness and thus take his statements in this regard at face value.

Mr. Gregorowicz explained that the Woodies building was unique in downtown Washington during this time because it contained substantial retail space, something of an anomaly at the time.   Tr. 658-59.   That statement was confirmed by Mr. Smale, Mr. Jemal, and Mr. Valentine.   Tr. 128, 659, 1167.   Mr. Jemal further explained that retail space in downtown Washington, DC during the late 1990s and early 2000s was a "morgue" and had been "redlined" by retailers as an area to avoid.   Tr. 1167-68, 1192-94. Although redevelopment of the Woodies Building into a mixed retail and office building was highly valued by the DC administration, retail initially was a drag on the project.   Tr. 1167-68.   In order to attract retailers, Woodies undertook significant publicity and advertising of the space.

The first retail vendor lured to the building by Woodies was H&M in 2002. *See* PX 130 (H&M lease).   Williams and Sonoma was next in 2006, Zara in 2007, Madam Tussaud's in 2007, and Forever 21 in 2008.   *See* PX 134; PX 135, PX 136, PX 137 (retail leases).

Despite the eventual success in enticing retailers to the Woodies Building, in late 2002, the success of that effort was no foregone conclusion.   Mr. Jemal thus explained that Woodies' approach to the lease with GSA was that the value was in the office space; there was not yet any significant value in the retail space.   Tr. 1190.   [



].   This is evidence, in plaintiff's view, of the merit of its claim that it did not, at least at the time of lease 1641, value the retail space as contributing meaningfully to the value of the Woodies Building.   Plaintiff points to

these facts as reasons why Mr. Jemal was not surprised to learn that GSA was willing to accept the smaller building size number.

After lease 1641, Woodies believed the issue of retail space was resolved as not being included in the total building size and thus did not see necessary the need to include retail space in the Form 1364s in response to the SFOs after lease 1641 was formed.   We explained above why it did not do so with regard to the Form 1217s that it submitted.

We are thus left with plaintiff's plausible explanation for why it had no reason to think that GSA was making a mistake with regard to leases 1641, 1751, 1809, and 1838.   On the other hand, we have the testimony of government employees that they did not mean to omit the retail space and did not recall having spoken with anyone at Woodies regarding the issue. That is insufficient to bridge the gap to find for the government.   The burden on defendant is to establish Woodies' knowledge by clear and convincing evidence.   In the face of plausible competing evidence, defendant is well short of establishing that Woodies knew or should have known that GSA was making a mistake.

B.   Lease 2154

The conclusion is the same as to lease 2154.   Although we hold that defendant has not established the predicate mistake, it is worth noting that, even if we found a mistake to have been made with Lease 2154, Mr. Gregorowicz's testimony that he called GSA to discuss the issue of retail space would, in the absence of other damning evidence, preclude a finding that Woodies knew or should have known that GSA was making a mistake.

In sum, although we are satisfied that defendant has proven by clear and convincing evidence that a mistake was made as to the total building size listed in leases 1641, 1751, 1809, and 1838, we find that defendant bore the risk of that mistake because it ignored too great a volume of accurate information and was not misled by plaintiff.   As to lease 2154, we find that no mistake was proven.   As to all of the leases, we find that plaintiff lacked the requisite knowledge of the mistake.   Plaintiff is therefore entitled to all of the withheld real estate and BID tax adjustment payments.

IV.   Interest

Plaintiff's entitlement to damages having been established, we turn to its claim for interest.   There is no dispute that plaintiff is entitled to simple interest for the amounts due under the lease pursuant to the Contract Disputes Act ("CDA") and the applicable clauses in the leases, which read: "The Government shall pay interest on the amount found due and unpaid from (1) the date that the Contracting Officer receives the claim (certified, if required); or (2) the date that payment otherwise would be due, if that date is later, until the date of payment."   DX 44 at 110 (Lease 1751); DX 49 at 108 (Lease 1809); DX 51 at 110 (Lease 1838); DX 70 at 83 (Lease 2154).   Plaintiff's expert used this clause to apply CDA interest from the date of the initial certified claim and then from the date of any amounts due that arose after the date of the certified claim.   Defendant, in its supplemental brief, offered that CDA interest could be calculated on the whole amount, including amounts that came due after the certified claim, as of the date of the claim to the CO.

Plaintiff also claims it is owed Prompt Payment Act interest for the first year that each amount was owed it under the lease.   The contracts provide:

> An interest penalty shall be paid automatically by the Government, without request from the Contractor, if payment is not made by the due date . . . . The interest penalty shall accrue daily on the payment amount approved by the Government and be compounded in 30-day increments inclusive from the first day after the due date through the payment date.

DX 44 at 101; DX 49 at 99; DX 51 at 101; DX 70 at 73.   The parties agree that this refers to the Prompt Payment Act, which requires agencies to pay an "interest penalty to the concern on the amount of the payment due" compounded every 30 days until payment is made, up to a year.   31 U.S.C. § 3902-907 (2012).   The interest rate is set by the Secretary of the Treasury pursuant to 41 U.S.C. § 7109 (2012).   *Id.* § 3902(a).

Plaintiff's expert, Ms. Brun, calculated the interest owed with one year of Prompt Payment interest and without it.   Defendant argues that no Prompt Payment interest is owed because the Act does not require a penalty

"on a payment that is not made because of a dispute" between the parties to a contract. 31 U.S.C. § 3907(c). "A claim related to the dispute, and interest payable for the period during which the dispute is being resolved," are subject to the normal CDA interest provisions. *Id.* Plaintiff avers that, as of the date that GSA began withholding payment, there was no dispute regarding the percentage of occupancy of the building; GSA had stopped paying due to its erroneous belief that the base year had not been established, a claim that the court rejected in February 2015. Alternatively, plaintiff claims that, even if the percentage of occupancy was in dispute, the percentage of that payment that the government admits was owing should have Prompt Payment Act interest applied to it.

We find that the Prompt Payment Act is inapplicable under these circumstances. Section 3907 plainly exempts any amounts owed during the pendency of the base year dispute. After judgment was entered in case 12-59 on February 10, 2015, GSA continued to withhold tax adjustment and BID tax payments, prompting plaintiff to submit its certified claim to the CO on March 4, 2015, which GSA denied by written decision on August 10, 2015, citing the base year and the incorrect building size as reasons for non-payment. Although lease 1809 no longer had a base year dispute when the CO's final decision was issued, that dispute having been resolved prior by this court's judgment in February 2015, the decision reveals that a dispute over the percentage of occupancy persisted during the lease for that period. We thus find Prompt Payment Act interest inapplicable for any of the payments at issue here.[31]

We do find, however, that CDA interest is applicable to the entire amount that GSA failed to pay from the date of the initial certified claim in 2015 until the date of judgment. That approach is simpler, supported by the case law, and agreed to by defendant, although not yet calculated by Ms. Brun.

---

[31] We are not aware of any support for the notion that the court should filet the tax adjustment and BID clause invoices to apply Prompt Payment Act interest to the amounts the agency agreed it should have paid under its view of those clauses. The agency is not required to make two payments in order to protect itself against prompt payment interest.

CONCLUSION

Plaintiff has proven its entitlement to real estate tax adjustment and BID tax payments from 2012 forward for all of the leases at issue. Defendant has not proven by clear and convincing evidence its defense of unilateral mistake. Plaintiff is entitled to simple CDA interest on the sum of all of GSA's missed payments from March 4, 2015 to the date of judgment. Accordingly, the parties are directed to confer and propose an amount for judgment, or their respective positions regarding the amount for judgment, consistent with this opinion in a status report to be filed on or before June 21, 2019.

s/ Eric G. Bruggink
Eric G. Bruggink
Judge